Sanjay Wadhwa
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
(212) 336-0181



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>-against-<br><br>CR INTRINSIC INVESTORS, LLC,<br>MATHEW MARTOMA,<br>  and<br>DR. SIDNEY GILMAN,<br><br>Defendants,<br><br>and<br><br>CR INTRINSIC INVESTMENTS, LLC,<br>S.A.C. CAPITAL ADVISORS, LLC,<br>S.A.C. CAPITAL ASSOCIATES, LLC,<br>S.A.C. INTERNATIONAL EQUITIES, LLC,<br>  and<br>S.A.C. SELECT FUND, LLC,<br><br>Relief Defendants. | 12 Civ. 8466 (VM)<br><br>ECF CASE<br><br>AMENDED<br>COMPLAINT |

---

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint

against defendants CR Intrinsic Investors, LLC ("CR Intrinsic"), Mathew Martoma

("Martoma"), and Dr. Sidney Gilman ("Gilman"), and relief defendants CR Intrinsic

Investments, LLC, S.A.C. Capital Advisors, LLC ("S.A.C. Capital"), S.A.C. Capital

Associates, LLC, S.A.C. International Equities, LLC, and S.A.C. Select Fund, LLC
(collectively, the "Relief Defendants"), alleges as follows:

## SUMMARY

1.     This is an insider trading case where affiliated investment advisers and
their hedge funds made approximately $275 million in illegal profits or avoided losses in
July 2008 by trading ahead of a negative public announcement involving the clinical trial
results for an Alzheimer's drug being jointly developed by Elan Corporation, plc ("Elan")
and Wyeth.

2.     Martoma, then a portfolio manager at CR Intrinsic, an unregistered
investment adviser, perpetrated the scheme with Gilman, a professor of neurology at the
University of Michigan Medical School. Gilman served as the chairman of the Safety
Monitoring Committee (the "SMC") overseeing the clinical trial, and was selected by
Elan and Wyeth to present the final clinical trial results at a July 29, 2008 medical
conference, which was to coincide with the after-market hours public announcement of
the trial results by the two companies (the "July 29 Announcement").

3.     Martoma met Gilman through paid consultations that took place between
2006 and 2008, and were arranged by a New York-based expert network firm. During
these consultations, Gilman provided Martoma with material nonpublic information
about the ongoing clinical trial. In addition, starting on or around July 17, 2008, Gilman
provided Martoma with the actual, detailed results of the clinical trial, in advance of the
July 29 Announcement.

4.     After Martoma received this information, he caused hedge fund portfolios
managed by CR Intrinsic as well as hedge fund portfolios managed by S.A.C. Capital not

2

only to liquidate their combined long positions in Elan and Wyeth, worth over $700 million, but also to take substantial short positions, eventually selling over $960 million in Elan and Wyeth securities in just over a week. This massive re-positioning allowed the CR Intrinsic and S.A.C. Capital hedge funds to collectively reap illicit profits and avoid losses of approximately $275 million.

5.     These illicit gains resulted from trades placed by or on behalf of the CR Intrinsic portfolios controlled by Martoma, and the S.A.C. Capital portfolios controlled by that entity's portfolio manager ("Portfolio Manager A"), who collaborated closely with Martoma in making the trading decisions.

6.     At the end of 2008, Martoma received a $9.3 million bonus, a significant portion of which was attributable to the illegal profits that the CR Intrinsic and S.A.C. Capital hedge funds had generated in this scheme.

7.     Gilman received over $100,000 from the expert network firm for his consultations with Martoma and others at CR Intrinsic and S.A.C. Capital.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the defendants (other than Gilman as to whom a judgment ordering permanent injunctions was entered by the Court on November 21, 2012), enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and disgorgement, on a joint and several basis, of all ill-gotten gains, including profits

realized and losses avoided from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest (other than Gilman as to whom a judgment ordering disgorgement of Gilman's ill-gotten gains, together with prejudgment interest, was entered by the Court on November 21, 2012). The Commission also seeks civil penalties against each of the defendants pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]. The Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.      Venue lies in this Court pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York. The expert network firm, which arranged telephone calls between Martoma and Gilman, and paid Gilman for the consultations, is headquartered in New York, New York. An affiliate of S.A.C. Capital has an office in New York, New York, and Martoma occasionally used this office, including for one meeting with Gilman. During the time of the conduct at issue, Wyeth and Elan securities were listed on the New York Stock Exchange (the "NYSE"), which is located in New York, New York.

## DEFENDANTS

11.     **CR Intrinsic** is an unregistered investment adviser located in Stamford,

Connecticut and an affiliate of S.A.C. Capital.

12.     **Martoma**, age 38, resides in Boca Raton, Florida.  Martoma worked at

CR Intrinsic between 2006 and 2010, serving as a portfolio manager from at least January

1, 2008 until his departure from CR Intrinsic in 2010.  At all relevant times, Martoma had

trading authority over certain portfolios at CR Intrinsic.

13.     **Gilman,** age 80, resides in Ann Arbor, Michigan.  Gilman is a medical

doctor by training, and a professor of neurology at the University of Michigan Medical

School.  Gilman served as a consultant to Elan and Wyeth from 2003 until 2009, when

Elan sold its interest in certain drugs to Jannsen/Pfizer.  Gilman also moonlighted as a

consultant for the expert network firm and was paid approximately $1,000 per hour for

his consultations.

## RELIEF DEFENDANTS

14.     **CR Intrinsic Investments, LLC** is a hedge fund affiliated with CR

Intrinsic that benefitted from the illegal insider trades in Elan and Wyeth securities that

Martoma and CR Intrinsic caused to be executed in July 2008.

15.     **S.A.C. Capital** is an investment adviser located in Stamford, Connecticut

that managed certain affiliated hedge funds that benefitted from the illegal insider trades

in Elan and Wyeth securities Martoma and CR Intrinsic caused to be executed in July

2008, and obtained increased fees as a result of the illicit gains from these trades.

16.     **S.A.C. Capital Associates, LLC** is a hedge fund that in July 2008 was affiliated with S.A.C. Capital and that benefitted from the illegal insider trades in Elan and Wyeth securities that Martoma and CR Intrinsic caused to be executed at that time.

17.     **S.A.C. International Equities, LLC** is a hedge fund that in July 2008 was affiliated with S.A.C. Capital and that benefitted from the illegal insider trades in Elan and Wyeth securities that Martoma and CR Intrinsic caused to be executed at that time.

18.     **S.A.C. Select Fund, LLC** is a hedge fund that in July 2008 was affiliated with S.A.C. Capital and that benefitted from the illegal insider trades in Elan and Wyeth securities that Martoma and CR Intrinsic caused to be executed at that time.[1]

## RELEVANT ENTITIES AND INDIVIDUAL

19.     **Elan** is a biotechnology company incorporated in Ireland, with its principal place of business in Dublin, Ireland.  Elan's Ordinary Shares trade on the Irish Stock Exchange and the London Stock Exchange and its American Depositary Receipts ("ADRs") — each representing one Ordinary Share — trade on the NYSE under the symbol "ELN."  Elan has reported as a foreign issuer since at least 1996.

20.     **Wyeth** was a pharmaceutical company incorporated in Delaware with its principal place of business in Madison, New Jersey.  Wyeth's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock traded on the NYSE under the symbol "WYE" until Wyeth was acquired by Pfizer in 2009.

21.     **Portfolio Manager A** is the owner and founder of S.A.C. Capital and CR Intrinsic.

---

[1] CR Intrinsic Investments, LLC, S.A.C. Capital Associates, LLC, S.A.C. International Equities, LLC, and S.A.C. Select Fund, LLC are herein collectively referred to as the "S.A.C. Capital and CR Intrinsic Funds."

## FACTS

### Non-Public Clinical Trials for Alzheimer's Drug Conducted by Elan and Wyeth

22.     Before a pharmaceutical company can release a new drug, it must conduct clinical trials to determine whether the drug is safe and effective in providing treatment to patients.  Clinical trials generally proceed in three phases.  In Phase I, a trial tests the drug on a small group of people (generally, 20-80) to determine its safety, determine a safe dosage range, and identify side-effects.  In Phase II, the drug is given to a larger group of people (generally, 200-300) to determine if it is effective and further evaluate its safety. Finally, in Phase III, the drug is given to large groups of people to confirm its effectiveness, its safety and to monitor any side-effects.

23.     Between 2006 and 2008, Elan and Wyeth jointly conducted a Phase II clinical trial for a potential drug to treat Alzheimer's disease called bapineuzumab ("bapi") (the "Phase II Trial").  The Phase II Trial was designed to assess the safety and tolerability of bapi in mild-to-moderate Alzheimer's disease, and to explore bapi's efficacy at a range of doses.

24.     Elan and Wyeth released top-line results of the Phase II Trial on June 17, 2008 (the "June 17 Announcement"), and released the detailed final results of the trial in the July 29 Announcement.  The market reacted positively to the June 17 Announcement; the day after the announcement, the stock prices of Elan and Wyeth rose more than 10% and 4%, respectively.  However, following the June 17 Announcement, investors were immediately looking ahead to the expected release of the detailed results on July 29.  As one analyst put it, the "[p]resentation of more complete data at [a scheduled conference on Alzheimer's disease] at the end of July will be a much anticipated event as investors

7

should gain much greater insight into the drug's safety and efficacy profile as well as whether there may be the possibility for an accelerated registration strategy."

25.     Despite the market's positive reaction to the June 17 Announcement, the more detailed July 29 Announcement failed to meet the market's expectations and caused the stock price of Elan to plummet approximately 42% and the stock price of Wyeth to drop almost 12% by the end of the day following the announcement.

**Gilman's Access to Material Nonpublic Information Concerning the Phase II Trial and his Duty of Confidentiality**

26.     Gilman, who served as a consultant for Elan, had continuing access to material nonpublic information concerning the Phase II Trial.  First, Gilman served as the chairman of the Phase II Trial's SMC, which met regularly between 2006 and 2008 to discuss the health of the trial participants.  In addition, Gilman agreed to present, on behalf of Elan and Wyeth, the Phase II Trial results at the International Conference on Alzheimer's Disease (the "ICAD"), a medical conference that was scheduled to be held on July 29, 2008.  As a result of agreeing to serve as the presenter at the ICAD, Gilman was given access to the full Phase II Trial results approximately two weeks prior to the July 29 Announcement.  Elan paid Gilman approximately $79,000 for his consultations concerning bapi in 2007 and 2008.

27.     By virtue of his roles in the clinical trial, and in accordance with the terms of his contract with Elan, Gilman owed Elan a duty to hold in strict confidence all information he learned in connection with his participation in the clinical trial and to use such information only for Elan's benefit.  The consulting agreement between Elan and Gilman provided that "[a]ny and all information which Elan may disclose to Consultant under this Agreement will be considered confidential . . . ."  In addition, the SMC

Operating Guidelines, to which Gilman was subject, provided that "strict confidentiality will be maintained by all the SMC members in accordance with written agreement with" Elan.

28.     Gilman also received training on the prohibitions of the federal securities laws from the expert network firm, which repeatedly reminded Gilman not to share nonpublic information with clients. Emails sent to Gilman by the expert network firm also listed bapi as a topic that Gilman was "not allowed to discuss."

**Gilman Provides Martoma Material Nonpublic Information Concerning the Phase II Trial**

29.     Gilman first met Martoma through paid consultations arranged by the expert network firm. Between 2006 and 2009, Gilman earned approximately $108,000 from fifty-nine consultations with portfolio managers and analysts at CR Intrinsic and S.A.C. Capital, including forty-two consultations just with Martoma. Over time, Gilman developed a personal relationship with Martoma, eventually coming to view Martoma as a friend and pupil.

30.     Gilman provided Martoma with material nonpublic information concerning the Phase II Trial starting in at least 2007. As a member of the SMC, Gilman received periodic updates from Elan concerning nonpublic safety data for the ongoing trial. For example, in advance of each SMC meeting, Elan sent Gilman a PowerPoint presentation that included dosage information, and information concerning side-effects that patients in the Phase II Trial were experiencing.

31.     Starting in at least 2007, Gilman would call Martoma after an SMC meeting to share with Martoma what he had just learned during the meeting. During these calls, Gilman discussed the PowerPoint presentations and provided Martoma with

his perspective on the results. Gilman's consultations with Martoma frequently occurred on the same day or shortly after Gilman had attended the SMC meeting. For example, Gilman had consultations with Martoma on February 9, 2007 (the day following an SMC meeting), October 9, 2007 (less than three hours after an SMC meeting), and March 18, 2008 (three hours after an SMC meeting).

32.    Martoma and Gilman coordinated their expert network consultations around scheduled SMC meetings. For example, on August 23, 2007, Gilman emailed Martoma, saying "[t]he SMC teleconference will be postponed until the following week. Should we postpone our planned teleconferences until a more definitive date [for the SMC teleconference] has been established?" Likewise, when the SMC meeting was not rescheduled as expected, Gilman emailed Martoma on September 5, 2007 to report that the SMC meeting had still not been scheduled and noted to Martoma, "you may want to postpone [our scheduled conference call] until there is more to discuss." Gilman next consulted with Martoma through the expert network firm on October 9, 2007 — three hours after the next SMC meeting.

33.    On at least one occasion prior to July 2008, Gilman emailed Martoma concerning specific — and as yet nonpublic — data from the Phase II Trial that Gilman had obtained from a PowerPoint presentation from Elan. The email to Martoma, which Gilman labeled "For Your Eyes Only" and "High Priority," explicitly referenced the dropout rate for the bapi clinical trial and referred to how many patients took bapi during each round of the trial. The figures used in the email (including certain mathematical errors) were taken directly from a slide in the Elan-prepared PowerPoint presentation used at the March 18, 2008 SMC meeting.

34.     Martoma and Gilman also took steps to conceal the true topic of their conversations from the expert network firm. For example, when Martoma scheduled a consultation with Gilman three hours after the March 18, 2008 SMC meeting, Martoma reported to the expert network firm that the purpose of the call was "Follow-up with Dr. Gilman: AAN Abstract Preview" even though Martoma and Gilman had discussed the Phase II Trial during the consultation. Later, in advance of a consultation that Gilman's personal calendar noted was to discuss side-effects that the Phase II Trial was finding in patients taking bapi, Gilman emailed Martoma and asked him to set up a consultation with the expert network firm, suggesting that Martoma tell the expert network firm that the consultation was to discuss a drug to treat Parkinson's disease.

**The CR Intrinsic and S.A.C. Capital Portfolios Establish Long Positions in Elan and Wyeth Prior to July 2008**

35.     Throughout 2007 and up to July 2008, the CR Intrinsic and S.A.C. Capital portfolios established substantial long positions in Elan and Wyeth securities. As of June 30, 2008, the CR Intrinsic portfolios owned over $233 million worth of Elan securities and over $80 million of Wyeth stock. The combined holdings in Elan and Wyeth securities represented approximately 14% of the CR Intrinsic portfolios' entire equity position at that time. Similarly, as of June 30, 2008, the S.A.C. Capital portfolios owned over $293 million of Wyeth stock and over $95 million of Elan securities, which represented over 4% of the S.A.C. Capital portfolios' entire equity position at that time.

Finally, in addition, the S.A.C. Capital portfolios also held an equity swap position with respect to 12 million shares of Wyeth stock.[2]

36.     CR Intrinsic's and S.A.C. Capital's Elan and Wyeth positions were held primarily in portfolios controlled by Martoma and Portfolio Manager A, respectively. Martoma included Elan and Wyeth as "long ideas" in his weekly portfolio updates circulated between January 1, 2008 and early July 2008 to Portfolio Manager A, among others, and listed the release of the Phase II Trial results as an "[u]pcoming catalyst." Portfolio Manager A invested in Elan and Wyeth securities based in part on the advice of Martoma.

37.     Martoma and Portfolio Manager A maintained their bullish positions in Elan and Wyeth even though there was significant dissent within CR Intrinsic and S.A.C. Capital on the wisdom of a large unhedged investment in Elan and Wyeth securities.  In March and April of 2008, two analysts at CR Intrinsic repeatedly sent emails to Portfolio Manager A advocating against the Elan and Wyeth positions and suggesting trading strategies designed to hedge them.

38.     For example, on March 26, 2008, one of these analysts sent Portfolio Manager A an email with the subject line "ELN, (important, please read) negative reads from company and other buysiders" and listed several reasons why the analyst was concerned with the Elan position.  Portfolio Manager A forwarded the email to Martoma, who responded, "I read the message.  Nothing worrisome here.  Let me know when you

---

[2] An equity swap is a transaction, typically entered into with a broker-dealer, where a party receives cash flow based on the performance of the underlying equity for a specified period of time in exchange for paying a premium to the broker-dealer. Generally, a party will sell its equity position and buy the economic interest on the shares it sold via an equity swap when it desires to free up cash.

are free to discuss in detail." Martoma and Portfolio Manager A made no changes to their holdings despite the analysts' concerns. In fact, after the June 17 Announcement, Portfolio Manager A indicated he would no longer consider any investment ideas in Elan or Wyeth from these two CR Intrinsic analysts.

**Gilman's July 2008 Communications with Martoma Concerning the Trial Results**

39.     Martoma maintained his bullish view of Elan after the June 17 Announcement. In fact, in a June 30, 2008 email (sent when Elan securities were trading at approximately $35 per share), Martoma told Portfolio Manager A that he intended to add further to the Elan position, saying, "I think stock breaks $40 . . ." following the July 29 Announcement.

40.     In late June, Gilman learned that he likely would be selected to present the Phase II Trial results at the ICAD on July 29. After finding out about his selection, Gilman sent an email to Martoma with the subject line "Some news" and told Martoma to "[p]lease set up [an expert network firm] conversation re MS." During this consultation — purportedly about MS — Gilman informed Martoma that he would be the presenter of the final clinical trial results at the ICAD on July 29. After being named the presenter, Gilman arranged to travel to Elan's offices on July 15 and 16, 2008, so that he could learn the full results of the Phase II Trial.

41.     Thereafter, in the weeks leading up to the July 29 Announcement, Gilman had several telephone calls with Martoma during which he provided Martoma with material nonpublic information regarding not only the safety results, but also the efficacy results for the Phase II Trial. For example, on Friday, July 11, 2008, Gilman participated in an SMC meeting in which the safety results for the completed Phase II Trial as a whole

were discussed. Two days later, on Sunday, July 13, Gilman spoke with Martoma for more than 1 hour and 40 minutes. During this call, Gilman provided confidential information to Martoma concerning the completed Phase II Trial safety results. Gilman, in fact, explicitly noted in his electronic calendar that the purpose of this call with Martoma was to discuss "SAEs in bap" — referring to serious adverse effects, also known as side-effects, found in patients taking bapi.

42.     Towards the end of the July 13 call, Martoma and Gilman each created Outlook Calendar entries reflecting that they intended to speak again on July 17, 2008 — the day after Gilman returned from his scheduled meetings with Elan.

43.     On July 15, 2008, Gilman traveled to San Francisco in a private plane arranged by Elan to participate in two days of meetings concerning the Phase II Trial efficacy results. During these meetings, Gilman was briefed on the complete efficacy results of the trial, and also reviewed and commented upon a PowerPoint presentation that he would use to present the results at the ICAD.

44.     On July 17, 2008, after Gilman returned to Ann Arbor, an Elan officer sent Gilman an updated ICAD PowerPoint presentation in an email labeled "Confidential, Do Not Distribute." The twenty-four page PowerPoint included summaries of the detailed efficacy results and safety results for the Phase II Trial as well as additional commentary on how Elan and Wyeth were interpreting the data.

45.     Later in the afternoon of July 17, 2008, Gilman and Martoma had another lengthy phone call during which Gilman provided Martoma with confidential information regarding the detailed results of the Phase II Trial, including all the information contained in the PowerPoint presentation. At or about 3:00 pm on July 17, 2008, Martoma was

picked up at S.A.C. Capital's New York office for a one-way trip to his home in

Greenwich, Connecticut. At 4:15 pm, Martoma called Gilman from his home phone and

talked to Gilman for approximately 1 hour and 45 minutes.

46.     Shortly after this call, Gilman sent the PowerPoint presentation to

Martoma. Martoma subsequently called Gilman to request the password needed to open

the encrypted file, which Gilman provided.

47.     Gilman and Martoma continued to communicate after their July 17

conversation in the days leading up to the July 29 Announcement. In addition to three

short calls on July 18, Martoma and Gilman had a 39-minute conversation on July 22, a

23-minute conversation on July 24, and an approximately 11-minute conversation the day

before the July 29 Announcement.

**Martoma, CR Intrinsic, and S.A.C. Capital Trade Elan and Wyeth Securities Based
on the Material Nonpublic Information from Gilman**

48.     On the morning of Sunday, July 20, 2008, following his July 17 and 18

calls with Gilman, Martoma sought to speak with Portfolio Manager A about the Elan

positions that the CR Intrinsic and S.A.C. Capital portfolios had amassed to that point,

telling Portfolio Manager A by email that "[i]t's important" that they speak. Martoma

and Portfolio Manager A thereafter spoke for nearly 20 minutes. Martoma indicated to

Portfolio Manager A that Martoma was no longer "comfortable" with the Elan

investments held by the CR Intrinsic and S.A.C. Capital portfolios.

49.     On Monday, July 21, 2008, Portfolio Manager A's head trader at S.A.C.

Capital (the "Head Trader") began selling Elan and Wyeth securities held in the CR

Intrinsic and S.A.C. Capital portfolios that Martoma and Portfolio Manager A controlled.

Before the market opened on July 21, 2008, these portfolios held over 10.5 million Elan

securities worth over $365 million and over 7.1 million Wyeth shares worth over $335 million, for a total position size of over $700 million.

50.     At Portfolio Manager A's direction, the trades that the Head Trader executed in Elan and Wyeth securities between July 21 and July 29, 2008 were kept confidential even within CR Intrinsic and S.A.C. Capital.  For example, on July 21, 2008, the Head Trader emailed Martoma concerning the sales: "obviously no one knows except me[,] you and [Portfolio Manager A]."  Later, after the Head Trader sold CR Intrinsic's and S.A.C. Capital's portfolios' existing position in Elan, the Head Trader reported to Portfolio Manager A that "[w]e executed a sale of over 10.5 million ELN for [various portfolios at CR Intrinsic and S.A.C. Capital] at an avg price of 34.21. This was executed quietly and efficiently over a 4 day period through algos and darkpools and booked into two firm accounts that have very limited viewing access."

51.     Martoma also urged Portfolio Manager A and the Head Trader to sell the Elan securities in the CR Intrinsic and S.A.C. Capital portfolios quickly.  For example, on July 22, ten minutes after the Head Trader called Martoma, Martoma sent Portfolio Manager A an instant message at 1:22:34 p.m. saying, "would do more today if possible[,]" suggesting that Portfolio Manager A sell more Elan ADRs.  At 1:22:50 p.m., Portfolio Manager A responded, in relevant part, "we are done on 2.3 today[.]"  Martoma replied, "my sense is today-thurs are best days so if possible to do more, would do so[.]"  After receiving Martoma's message, Portfolio Manager A sold over an additional 2.2 million Elan ADRs on July 22.

52.     In total, between July 21, 2008 and July 29, 2008 (the last trading day before the post-market July 29 Announcement), the CR Intrinsic and S.A.C. Capital

portfolios sold over 15 million Elan securities for gross proceeds of over $500 million. Although the investment advisers' portfolios achieved a zero balance in Elan securities by July 25, 2008, they continued to sell short Elan securities until the July 29 Announcement.[3] By the close of the market on July 29, 2008, the CR Intrinsic and S.A.C. Capital portfolios had a combined short position of approximately 4.5 million Elan securities. The trading by the CR Intrinsic and S.A.C. Capital portfolios in Elan securities constituted over 20% of the reported trading volume in the seven days prior to the July 29 Announcement.

53.     In addition, between July 21, 2008 and July 29, 2008, the CR Intrinsic and S.A.C. Capital portfolios sold over 10.4 million shares of Wyeth for gross proceeds of over $460 million, including over 6.1 million Wyeth shares worth over $270 million during the very day of the July 29 Announcement. As a result of these sales, the CR Intrinsic and S.A.C. Capital portfolios had a zero balance in Wyeth stock during the trading day on July 29, 2008, but continued to place short sales that day. By the close of the market on July 29, 2008, the CR Intrinsic and S.A.C. Capital portfolios had a combined short position of approximately 3.3 million Wyeth shares. The trading by the CR Intrinsic and S.A.C. Capital portfolios in Wyeth securities constituted over 11% of the reported trading volume in the seven days prior to the July 29 Announcement.

54.     The chart below summarizes CR Intrinsic's and S.A.C. Capital's portfolios' combined equity positions in Elan and Wyeth before the markets opened on

---

[3] To "sell short" is to sell a security that one does not own, but rather has arranged to borrow from a third party, with the intention of purchasing (also called "covering") the security at a later date to deliver to the lender. A short seller stands to gain if the price of the security declines between the short sale and the purchase because the short seller has sold the security at a price that is greater than the purchase price.

July 21, 2008, and the trading with respect to those securities prior to the July 29

Announcement:

| Description | Elan ADRs | Wyeth Stock |
|---|---|---|
| Equity Positions Before Trading Opened On July 21, 2008 | >10.5 million shares | >7.1 million shares |
| Value of Equity Positions | >$365 million | >$335 million |
| Sales (Long and Short) between July 21 and July 29 | >15 million shares | >10.4 million shares |
| Total Sales Proceeds | >$500 million | >$460 million |
| Short Position Held Prior to July 29 Announcement | 4.5 million shares | 3.3 million shares |
| Percentage of Marketwide Sales Volume | >20% | >11% |

55.    CR Intrinsic and S.A.C. Capital also placed options trades in Elan ADRs

that bet on the ADR share price going down.  For example, on July 28 and July 29, the

CR Intrinsic and S.A.C. Capital portfolios purchased over $1 million worth of Elan put

options with strike prices below the Elan ADR share price on those trading days.[4]

**Elan and Wyeth Issue a Negative Announcement Concerning the Phase II Trial**

56.    On July 29, 2008, after the close of U.S. securities markets, Gilman

presented the results of the Phase II Trial at the ICAD, and Elan and Wyeth issued a press

release summarizing the results.  Although Elan and Wyeth emphasized the positive

aspects of the trial, the press release and Gilman's presentation included additional details

---

[4] A put option is a financial contract between two parties that gives the buyer the right, but not the obligation, to sell an agreed quantity of stock during a specified time period at a specified price.  A buyer of a put option pays a premium to purchase this right, and generally stands to gain if the price of the stock decreases.

not included in the June 17 Announcement, and the market reacted negatively to the full results.

57.     On July 30, 2008, the first trading day after the July 29 Announcement, Elan's share price fell from $33.75 (the closing price on the day of the announcement) to $19.63 (the closing price on the day after the announcement), a decline of approximately 42%. Wyeth's stock price fell from $45.11 (the closing price on the day of the announcement) to $39.74 (the closing price the day after the announcement), a decrease of approximately 12%.

**Profits Reaped and Losses Avoided by CR Intrinsic and S.A.C. Capital**

58.     As a result of the trades that were entered into during the period between Martoma's conversation with Gilman on July 17, 2008 and the July 29 Announcement, CR Intrinsic and S.A.C. Capital portfolios in which Martoma and Portfolio Manager A had trading authority reaped profits and avoided losses of approximately $275 million as follows (figures are approximate):

| Description | Elan | Wyeth |
| --- | --- | --- |
| Profits from Short Sales | $59.2 million | $16 million |
| Profits from Option Trades | $5.1 million | N/A |
| Losses Avoided | $154.2 million | $40.4 million |
| **Total Illicit Gain** | **$218.5 million** | **$56.4 million** |

59.     Following certain allocations made after the July 29 Announcement, the profits and avoided losses were distributed roughly evenly between the CR Intrinsic portfolios, which reaped profits and avoided losses of approximately $138 million, and

19

the S.A.C. Capital portfolios, which reaped profits and avoided losses of approximately $137 million.

**Martoma's Reward for His Profitable Trades and His Departure From CR Intrinsic**

60.     At the end of 2008, Martoma received a bonus of over $9.3 million that included a percentage of the Elan trading profits in the CR Intrinsic portfolios, as well as a share of the Elan profits in certain S.A.C. Capital portfolios.

61.     In contrast to 2008, which had been a banner year for him, Martoma was unable to generate such winning trades or outsized returns in 2009 and 2010, and did not receive a bonus in either of those years. In a 2010 email suggesting that Martoma's employment be terminated, a S.A.C. Capital officer stated that Martoma had been a "one trick pony with Elan."

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Defendants CR Intrinsic, Martoma, and Gilman)

62.     The Commission realleges and incorporates by reference paragraphs 1 through 61, as though fully set forth herein.

63.     The information provided by Gilman to Martoma concerning the Phase II Trial was, in each case, material and nonpublic. In addition, the information was, in each case, considered confidential by Elan and the SMC for the Phase II Trial, which were the sources of the information, and Elan and the SMC had policies protecting confidential information.

64.    Gilman provided the material nonpublic information to Martoma in breach of the fiduciary duty that Gilman owed to Elan and the SMC, and did so with the expectation of receiving a benefit.

65.    Martoma knew, recklessly disregarded, or should have known, that Gilman owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

66.    Martoma and CR Intrinsic each caused the S.A.C. Capital and CR Intrinsic Funds to trade based on material nonpublic information concerning the Phase II Trial, with the expectation of a benefit from doing so, and each knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

67.    Martoma and CR Intrinsic each knew, recklessly disregarded, or should have known, that the material nonpublic information concerning the Phase II Trial that each received from their respective tippers was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

68.    CR Intrinsic, Martoma, and Gilman are jointly and severally liable for the trading of the S.A.C. Capital and CR Intrinsic Funds because they each directly or indirectly effectuated the trades on behalf of the funds and/or unlawfully disclosed the material nonpublic information to the funds.

69.    By virtue of the foregoing, defendants CR Intrinsic, Martoma, and Gilman, and each of them, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes

or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

70.     By virtue of the foregoing, defendants CR Intrinsic, Martoma, and Gilman, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## CLAIM II
### Violations of Section 17(a) of the Securities Act
### (Against Defendants CR Intrinsic, Martoma, and Gilman)

71.     The Commission realleges and incorporates by reference paragraphs 1 through 70, as though fully set forth herein.

72.     By virtue of the foregoing, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, defendants CR Intrinsic, Martoma, and Gilman, and each of them:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

73.     By reason of the conduct described above, each of the defendants directly or indirectly violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### CLAIM III
### Unjust Enrichment
### (Against Relief Defendants)

74.     The Commission realleges and incorporates by reference paragraphs 1 through 73, as though fully set forth herein.

75.     Each of the S.A.C. Capital and CR Intrinsic Funds earned profits or avoided losses as a result of the violations by CR Intrinsic, Martoma, and Gilman, as alleged above, under circumstances in which it is not just, equitable or conscionable for the S.A.C. Capital and CR Intrinsic Funds to retain the funds.  As a result of the foregoing, the S.A.C. Capital and CR Intrinsic Funds were unjustly enriched.

76.     S.A.C. Capital earned increased fees as a result of the violations by CR Intrinsic, Martoma, and Gilman, as alleged above, under circumstances in which it is not just, equitable or conscionable for S.A.C. Capital to retain the funds.  As a result of the foregoing, S.A.C. Capital was unjustly enriched.

### RELIEF SOUGHT

**WHEREFORE,** the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining defendants CR Intrinsic and Martoma, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Permanently restraining and enjoining defendants CR Intrinsic and Martoma, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

## III.

Ordering defendants CR Intrinsic and Martoma to disgorge, on a joint and several basis, with prejudgment interest, all ill-gotten gains received as a result of the conduct alleged in this Complaint, including their ill-gotten gains, and the illicit trading profits, other ill-gotten gains, and/or losses avoided of their direct and downstream tippees;

## IV.

Ordering defendants CR Intrinsic, Martoma, and Gilman to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1];

## V.

Ordering each of the Relief Defendants to disgorge with prejudgment interest on a joint and several basis with CR Intrinsic all funds unlawfully obtained by which they were unjustly enriched, which in the case of relief defendant S.A.C. Capital, includes joint and several liability for the amounts by which S.A.C Capital Associates, LLC, S.A.C. International Equities, LLC, and S.A.C. Select Fund, LLC were unjustly enriched; and

**VI.**

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      March 15, 2013

 

                                     _Sanjay Wadhwa_
                                     Sanjay Wadhwa
                                     Senior Associate Director
                                     Attorney for Plaintiff
                                     SECURITIES AND EXCHANGE
                                     COMMISSION
                                     New York Regional Office
                                     3 World Financial Center, Suite 400
                                     New York, New York 10281-1022
                                     (212) 336-0181
                                     WadhwaS@sec.gov

Of Counsel:

Amelia A. Cottrell (CottrellA@sec.gov)
Charles D. Riely (RielyC@sec.gov)
Matthew J. Watkins (WatkinsMa@sec.gov)