USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/16/13

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

SECURITIES AND EXCHANGE COMMISSION, :
                                     :
                Plaintiff,           :
                                     :          12 Civ. 8466 (VM)
        -  against  -                :
                                     :
CR INTRINSIC INVESTORS, LLC,         :
MATHEW MARTOMA, and DR. SIDNEY       :
GILMAN,                              :
                Defendants,          :          **OPINION**
                                     :
and                                  :          **DECISION AND ORDER**
                                     :
CR INTRINSIC INVESTMENTS, LLC,       :
S.A.C. CAPITAL ADVISORS, LLC,        :
S.A.C. CAPITAL ASSOCIATES, LLC,      :
S.A.C. INTERNATIONAL EQUITIES, LLC, :
and S.A.C. SELECT FUND, LLC,         :
                                     :
                Relief Defendants.   :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

On November 20, 2012, the United States Securities and Exchange Commission (the "SEC") brought this action against defendants CR Intrinsic Investors, LLC ("CR Intrinsic"), Mathew Martoma ("Martoma"), and Sidney Gilman (collectively, "Defendants") alleging violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and § 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q ("§ 17(a)").

1

On March 15, 2013, the SEC filed an amended complaint in this action (the "Amended Complaint"). The Amended Complaint alleged that CR Intrinsic participated in an insider trading scheme that caused hedge fund portfolios managed by CR Intrinsic and S.A.C. Capital Advisors, LLC ("SAC Capital") to generate approximately $275 million in illegal profits or avoided losses. The Amended Complaint also contained a new claim of unjust enrichment against five relief defendants: (a) CR Intrinsic Investments, LLC; (b) S.A.C. Capital; (c) S.A.C. Capital Associates, LLC; (d) S.A.C. International Equities, LLC; and (e) S.A.C. Select Fund, LLC (collectively, the "Relief Defendants").

That same day, the SEC also submitted to the Court for its approval a "Final Judgment As To Defendant CR Intrinsic Investors, LLC" (the "CR Intrinsic Consent Judgment"), together with a "Consent of Defendant CR Intrinsic Investors, LLC" (the "CR Intrinsic Consent") that provided that CR Intrinsic consented to the entry of the CR Intrinsic Consent Judgment "[w]ithout admitting or denying the allegations of the Complaint . . . ." CR Intrinsic Consent ¶ 2. The CR Intrinsic Consent Judgment: (a) "permanently restrained and enjoined" CR Intrinsic from future violations of § 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and § 17(a) of the Securities

Act; (b) required CR Intrinsic, on a joint and several basis with the Relief Defendants, to disgorge to the SEC $274,972,541, representing the profits gained and losses avoided of CR Intrinsic and the Relief Defendants, together with pre-judgment interest of $51,802,381.22; and (c) required CR Intrinsic to pay to the SEC a civil penalty in the amount of $274,972,541.

The SEC also submitted to the Court for its approval: (1) a "Final Judgment as to Relief Defendant CR Intrinsic Investments, LLC," together with a "Consent of Relief Defendant CR Intrinsic Investments, LLC"; (2) a "Final Judgment as to Relief Defendant S.A.C. Capital Advisors, LLC," together with a "Consent of Relief Defendant S.A.C. Capital Advisors, LLC"; (3) a "Final Judgment as to Relief Defendant S.A.C. Capital Associates, LLC," together with a "Consent of Relief Defendant S.A.C. Capital Associates, LLC"; (4) a "Final Judgment as to Relief Defendant S.A.C. International Equities, LLC," together with a "Consent of Relief Defendant S.A.C. International Equities, LLC"; and (5) a "Final Judgment as to Relief Defendant S.A.C. Select Fund, LLC," together with a "Consent of Relief Defendant S.A.C. Select Fund, LLC" (collectively, the "Relief Defendant Consent Judgments" and the "Relief Defendant Consents" respectively). The Relief Defendant Consents

provide that the Relief Defendants consent to the entry of the Relief Defendants Consent Judgments "[w]ithout admitting or denying the allegations of the Complaint . . . ." See, e.g., Consent of Relief Defendant CR Intrinsic Investments, LLC, ¶ 2. The Relief Defendant Consent Judgments provide that the Relief Defendants are jointly and severally liable for certain portions of CR Intrinsic's disgorgement figure, as well as the pre-judgment interest thereon.

Upon receipt of these submissions, the Court, by Order dated March 22, 2013, scheduled a conference with the parties, which was held on March 28, 2013, to consider the proposed settlements and to discuss the issues raised recently by some courts in reviewing regulatory agency settlements containing "neither admit nor deny" provisions such as those before the Court, for example S.E.C. v. Citigroup Global Markets, Inc., 827 F. Supp. 2d 328 (S.D.N.Y. 2011) ("Citigroup I"), which is now on appeal before the U.S. Court of Appeals for the Second Circuit. See S.E.C. v. Citigroup Global Mkts. Inc., 673 F.3d 158 (2d Cir. 2012) ("Citigroup II").

## I.  LEGAL STANDARD

The role of the Court in reviewing and approving proposed consent judgments in SEC enforcement actions is

"restricted to assessing whether the settlement is fair, reasonable and adequate within the limitations Congress has imposed on the SEC to recover investor losses." S.E.C. v. Cioffi, 868 F. Supp. 2d 65, 74 (E.D.N.Y. 2012); United States v. Peterson, 859 F. Supp. 2d 477, 478 (E.D.N.Y. 2012) ("A district court has the duty to determine whether a consent decree based on a proposed settlement is 'fair and reasonable.'") (quoting S.E.C. v. Wang, 944 F.2d 80, 84-85 (2d Cir. 1991)).

Courts should also weigh the effect of the proposed settlement in an SEC enforcement action on the public interest.[1] Courts "are bound in such matters to give

---

[1] To what degree a court may weigh the effect of the proposed consent judgment on the public interest "has recently been the subject of debate in the Second Circuit." Cioffi, 868 F. Supp. 2d at 72. On several occasions, Judge Rakoff of this district has described the standard for judicial review and approval of proposed consent judgments in SEC enforcement actions as "whether the proposed Consent Judgment . . . is fair, reasonable, adequate, and in the public interest." Citigroup I, 827 F. Supp. 2d at 330-31 (quoting S.E.C. v. Bank of Am. Corp., 653 F. Supp. 2d 507, 508 (S.D.N.Y. 2009) (Rakoff, J.)); see also S.E.C. v. Vitesse Semiconductor Corp., 771 F. Supp. 2d 304, 306-07 (S.D.N.Y. 2011). However, the Second Circuit indicated in Citigroup II that Judge Rakoff "misinterpreted" the rulings on which he relied for this proposition. Citigroup II, 673 F.3d at 166. The Second Circuit indicated that those rulings stood only for the proposition that a court, when ordering injunctive relief, should ensure that the injunctive relief, as opposed to the proposed settlement as a whole, "does not cause harm to the public interest." Id. Nonetheless, the Second Circuit then proceeded to consider the effect of the proposed settlement, as a whole, in that SEC enforcement action on the public interest. Compare Citigroup II, 673 F.3d at 168 ("The final factor to be considered is the public interest."), with id. at 163 ("The responsibilities for . . . . resolving the struggle between competing views of the public interest are not judicial ones.") (citations omitted); see also Federal Trade Comm'n v. Circa Direct LLC, Civ. No. 11-2172, 2012 WL 3987610, at *4 (D.N.J. Sept. 11, 2012) ("Because the Court's approval of the Stipulated Order signals its approval of the Stipulated Order as a whole, it naturally follows that it must retain

deference to an executive agency's assessment of the public
interest.   This does not mean that a court must necessarily
rubber stamp all arguments made by such an agency.   It does
mean at least that a court should not reject the agency's
assessment without substantial reason for doing so," such
as a finding that the proposed settlement was "arbitrary,
capricious, an abuse of discretion, or otherwise not in
accordance with the law."   Citigroup II, 673 F.3d at 168
(internal citations omitted); Cioffi, 868 F. Supp. 2d at 74
("A district court is surely not required to rubber stamp
every settlement between the SEC and a defendant.").

In assessing a proposed settlement in an SEC
enforcement action, a court should also consider, among
other factors:

> the connection between the settlement and any related
> pending or prospective criminal or civil cases.   The
> same defendant may be subject to multiple obligations,
> including the need to pay restitution to victims of
> his criminal conduct; private civil damages as a
> result of breach of contract or tortious activities;
> fines; and forfeiture to the government in both
> criminal and civil actions.

Peterson, 859 F. Supp. 2d at 478-79.

---

the ability to review all terms that comprise the settlement for
consistency with the public interest, including its lack of an
admission of liability.").

6

## II.   **DISCUSSION**

The CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments consist of two types of relief: (a) injunctive and (b) monetary.  The CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments also contain terms that provide that CR Intrinsic and the Relief Defendants consent to the proposed judgments "without admitting or denying" the allegations contained in the Amended Complaint.  See, e.g., CR Intrinsic Consent Judgment, 1.

With respect to the injunctive relief contained in the CR Intrinsic Consent Judgment, the Court concludes that this component of the proposed settlement is fair, adequate, reasonable, and in the public interest.  However, the Court hesitates from attaching "undue weight to the injunctive relief component," as it is "largely limited to prohibiting [CR Intrinsic] from future conduct that [the Exchange Act and the Securities Act] already prohibit[]." Federal Trade Comm'n v. Circa Direct LLC, Civ. No. 11-2172, 2012 WL 3987610, at *5 (D.N.J. Sept. 11, 2012) ("Circa II") (emphasis in original).

With respect to the monetary relief, the Court also concludes that the disgorgement amount, the pre-judgment interest thereon, and the civil penalty is fair, adequate,

reasonable, and in the public interest.   In the Amended
Complaint, the SEC has alleged approximately $275 million
in illegal profits or avoided losses.  <u>See</u> Am. Compl. ¶ 1.
Pursuant to the CR Intrinsic Consent Judgment and the
Relief Defendant Consent Judgments, CR Intrinsic and the
Relief Defendants are jointly and severally liable for
disgorgement of the entire alleged illegal profits or
avoided losses, together with pre-judgment interest, and CR
Intrinsic is responsible for an additional civil penalty
equal to the amount of the alleged illegal profits or
avoided losses.

Of course, how the SEC arrived at its calculation of
illicit profits and losses avoided may be a matter of
debate.  Reasonable experts may differ on such technical
questions about assumptions and methodology.  What is clear
to the Court in this regard is that it lacks a legitimate
basis either to question the adequacy of the monetary
terms, or to adjudge the SEC's decision to end the
litigation for these sums as irrational or arbitrary.  The
monetary relief here is significant and proportional to the
sums allegedly at issue; it does not resemble the amount
Judge Rakoff characterized as "pocket change" in the
proposed settlement of the SEC enforcement action in the
<u>Citigroup</u> action now on appeal in the Second Circuit.

8

Citigroup I, 827 F. Supp. 2d at 334 (commenting in part on the disparity between the SEC's $95 million civil penalty and the alleged illicit profits of $160 million).

However, the Court must also consider the appropriateness of the "neither admit nor deny" provisions contained in the CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments. The Court is troubled by these provisions as they permit CR Intrinsic and the Relief Defendants to resolve the serious allegations against them involving a massive insider trading scheme "without admitting or denying the allegations of the Complaint." See, e.g., CR Intrinsic Consent Judgment, 1. Whether or not a court reviewing a regulatory agency's resolution of civil proceedings may question the propriety of these types of provisions and reject a proposed settlement on this ground presents an issue now pending before the Second Circuit, whose decision is expected within weeks or months. See Citigroup II, 673 F.3d 158.

The absence of controlling appellate guidance at this time, combined with the imminence of a resolution of the issue by the Second Circuit, poses a quandary for this Court. Among the courses of action open to it, three merit comment. The Court could close its eyes and pretend that the pending appeal in Citigroup does not exist. As the

9

parties urge, the Court could endorse the proposed
settlement despite the Court's misgivings about the
"neither admit nor deny" clause.   If the Second Circuit
were then to rule definitively that district courts lack
authority to reject settlements on account of such
provisions, this Court's concerns, along with its approval
of the settlement, would be put to rest.

It would be presumptuous, however, for this Court to
speculate on how the Second Circuit would rule on the
question, and to assume that the decision will conclusively
foreclose rigorous inquiry by district courts into these
regulatory settlement agreements.   It is just as
conceivable that the Second Circuit's resolution would not
categorically curtail such scrutiny, but rather leave room
for the lower courts to exercise discretion within bounds
of specified appellate guidance.   In that event, this
Court's approval of the proposed settlement at this time
would prove premature, insofar as the Court would have
missed the opportunity to assess whether or not the
circumstances presented here would satisfy any standards
the Second Circuit would prescribe to govern such review.

Conversely, the Court could ignore Citigroup and
reject the proposed settlement entirely on the basis of the
provision in question.   Such a decision would be equally

problematic.  In that case, the ruling would run up against the also plausible outcome that the Second Circuit in Citigroup would reverse Citigroup I and hold that such a denial would be impermissible.

If Citigroup I had never happened, or if a resolution of its appeal were not so close at hand, the dilemma the Court describes above would not exist.  Under the circumstances, the most prudent course the Court sees open to it would be to approve the settlement subject to a condition that it would become final upon a definitive determination in the Citigroup appeal that district courts lack authority to reject such settlements on the basis of reservations about the "neither admit nor deny" provision. In the event the Second Circuit does leave ground for district courts to accord higher scrutiny to such terms, the Court articulates below the concerns and considerations that it regards as pertinent to its review.

In assessing the appropriateness of the "neither admit nor deny" provisions in the CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments, the Court must perform a very delicate balancing act, walking a tightrope between various competing interests.  It must recognize the complexities that characterize government law enforcement proceedings, the difficult policy calls, and the expertise

possessed by the administrative agencies entrusted with the responsibility to protect the public interest.   To this end, the Court must avoid undue meddling and second-guessing, and must accord government agency law enforcement and financial determinations such as those now before it the proper level of deference they are due.   At the same time, the Court cannot conceive that Congress intended the judiciary's function in passing upon these settlements as illusory, as a predetermined rubber stamp for any settlement put before it by an administrative agency, or even a prosecutor.   Such a minimalist conception of the Court's role would make a mockery out of Congressional intent in delegating approval authority to the courts in these matters and cramp judicial independence in this context.

The parties have stressed that the inclusion of "neither admit nor deny" provisions in regulatory settlements of civil proceedings is a longstanding and commonplace practice routinely pursued not only by the SEC, but by many other federal agencies.   See, e.g., Conference Tr., Mar. 28, 2013, at 10:10-20.   They have pointed out that, historically, courts in this district and others across the country, recognizing the sound practical and policy reasons warranting such a provision, have regularly

approved such agreements without questioning the inclusion of "neither admit nor deny" provisions. See, e.g., id. at 10:21-11:2; see also CR Intrinsic Letter, Apr. 4, 2013 at 2, Dkt. No. 32. Additionally, they emphasize, as this Court has acknowledged above, that a decision by a body of the executive branch of the federal government, particularly agencies possessing special expertise, to end an administrative enforcement action represents a prerogative that lies outside the ambit of the function of the judiciary, embodied in controlling doctrine requiring that courts accord due deference to such policy judgments. See, e.g., Conference Tr., Mar. 28, 2013 at 11:16-19; CR Intrinsic Letter, Apr. 4, 2013 at 2, Dkt. No. 32. The Court agrees with these salient arguments.

However, implicit in the parties' arguments is the premise that because the Court must accord deference to an administrative agency's special competence to commence and resolve administrative proceedings, and because traditionally courts have not questioned settlements of civil enforcement actions that contain "neither admit nor deny" provisions, therefore no circumstances exist in which enhanced judicial scrutiny, or perhaps even rejection, of a proposed consent judgment containing such a provision would be appropriate. In essence, the parties are telling the

13

Court that assessing the appropriateness of the inclusion of these "neither admit nor deny" provisions in this particular action is none of the Court's business.  Whether veiled or explicit, such a hard line overstates the judicial deference due to administrative policy determinations, suggesting a form of absolutism that is unwarranted by law or reasonable public policy.

If courts traditionally have not challenged the inclusion of "neither admit nor deny" provisions in civil enforcement actions, perhaps this outcome has obtained because fitting circumstances have not previously arisen that would compellingly justify that level of judicial intervention.  It should come as no surprise that judges called upon routinely to resolve cases of the domestic "cats and dogs" variety would take special note when the elephant is first dragged into the courtroom.  Nor should it startle anyone if among the questions the court raises on such an occasion is whether the rules of law meant to adjudicate the issues presented by one type of case should be extended to atypical others, or be adjusted to properly reflect the true nature of the beast.

The Court recognizes that there are circumstances, possibly even in the vast majority of cases, in which it is perfectly reasonable for parties to a regulatory proceeding

14

to agree to such a provision. A government regulatory
agency and a defendant may deem it mutually advisable and
beneficial – for public and private reasons, and on
financial, practical, and public policy grounds – to settle
civil enforcement proceedings without an admission of
wrongdoing. Among the obvious considerations are: the
resources necessary to prosecute and defend the action
fully; the level of vindication, penalty, and deterrence
achieved; the risks of loss weighed against the best the
party might stand to gain from proceeding further with the
action; exposure to liability from other lawsuits; business
disruptions and effects on good will.[2]  For example, where
the likely cost of litigation and the amount at stake are
relatively comparable, parties may agree to such a
provision to avoid the undue expense and risk associated
with proving culpability at trial. In addition, the Court
must recognize that, for the SEC, "[r]equiring [ ] an
admission [of culpability] would in most cases undermine
any chance for compromise" with corporate defendants who
face additional exposure from private lawsuits. Citigroup

---

[2] In addition, where all parties involved have limited access to crucial
information about the events in question, it may be reasonable for the
parties to agree to a monetary settlement of any potential claims
related to the events without an admission of liability. However,
here, the SEC has alleged detailed facts in the Amended Complaint
regarding the specific acts underlying the alleged massive insider
trading scheme. The alleged facts here are not shrouded in mystery.

II, 673 F.3d at 165.  In the run-of-the-mill case, these
concerns are likely to produce a reasonably balanced
outcome, reflecting a fair measure of proportionality,
defensible for the parties and other pertinent interests.

However, instances can and do arise in which courts
should properly raise the level of scrutiny they accord to
particular settlement agreements in particular situations.
Earlier precedents may not have entailed the extreme
disparity evident in recent cases between the size and
speed of a settlement on the one hand, and the plausibility
of an absence of wrongdoing on the other.

Perhaps we live in a different era.  In this age when
the notion labeled "too big to fail" (or jail, as the case
may be) has gained currency throughout commercial markets,
some cynics read the concept as code words meant as
encouragement by an accommodating public -- a free pass to
evade or ignore the rules, a wink and a nod as cover for
grand fraud, a license to deceive unsuspecting customers.
Perhaps, too, in these modern times, new financial,
industrial, and legal patterns have merged that call for
enhanced regulatory and, as appropriate, judicial oversight
to counter these sinister attitudes.  This prospect raises
concerns about whether the regulatory and judicial
practices which have governed to date fail to reflect what

16

new realities demand to adequately protect the public interest. Anyone who even superficially follows accounts of current events entailing well-known scandals - for instance those involving extensive fraud or excess in the financial markets, environmental disasters, and hazardous consumer products - is likely to be impressed by a quality many of these events share: massive scale whose effects go well beyond mere matters of degree.

A few other qualities about these events bear comment. In the real world, and in the eyes of the public whose perceptions pass judgment on official actions, harmful conduct on the scale of the contemporary models ordinarily does not occur absent some form of wrongdoing; the damage the victims suffer cannot always be blamed on acts of God or the mischief of leprechauns. For the people directly injured, and for others who share an interest in these matters implicating broad public concerns, the purposes of the justice system embodied in compensation, deterrence, and punishment cannot be adequately satisfied, and there cannot be proper closure when incidents causing extensive loss occur, if the individuals or entities responsible for the large scale wrongful consequences are not properly held accountable. These impressions hold doubly true in situations, such as may apply in the case at hand, where

strong evidence of wrongdoing exists, or where at least circumstantially, as embodied in the doctrine of res ipsa loquitur, the events are unlikely to have happened without substantial misconduct.

In appropriate cases, the vast scope of the harmful actions referred to here, and the reach of their consequences, ought to be assessed in two ways. Quantitatively, they should be gauged by the staggering amounts of money, both profits and losses, that typically are involved in the underlying wrongdoing that is alleged, with huge numbers of victims seriously injured worldwide, correspondingly matched by the perceived outsized rewards the offenders seek to derive from their illicit and damaging behavior. Qualitatively, the measure of these events should be taken by the sheer magnitude of the culpability the offending conduct presumptively would entail – the higher levels of daring, of risk-taking, of outright abuse that manifest tougher grades of arrogance and greed, as well as cavalier disdain for victims and the public good alike.

If true – a question that legislators, regulators, and other policy-makers, as well as judges when warranted, should closely examine within their respective domains – these new circumstances highlight the challenge of framing

18

a fair, adequate, and reasonable response by all bodies of government entrusted by law with protecting the public interest against such outsized malfeasance. In this Court's view, and perhaps as also perceived by other judges who recently have declined to grant uncritical approval to "neither admit nor deny" provisions in proposed consent judgments for administrative enforcement actions, some of the uniquely harmful fact patterns emerging from modern financial and industrial market scandals should not be thrown into the mix with the run-of-the-mill cases. To do so would overlook the distinctive features of this new breed of cases that might require enhanced scrutiny, more careful review, and better tailored resolution.

The question for the Court here is not whether a consent judgment could ever be found to be fair, adequate, reasonable, or in the public interest when it contains a "neither admit nor deny" provision. Instead, the proper inquiry is whether the CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments are fair, adequate, reasonable, and in the public interest given the specific circumstances and posture of this particular case. In the Court's view, there is nothing ordinary about the facts involved in this case. Rather, the circumstances presented here justify departing from the attitude of judicial

laissez-faire, advocated by the parties to this action, that has characterized judicial review of regulatory settlements in the past, and recognizing that an approach that may have been suitable for different times and different actions may not be fitting here. The Court must tailor its scrutiny of the agreements proffered by the parties in this case to reflect the proportional seriousness of the alleged injurious acts and their substantial after-effects.

Here, the SEC instituted this action on November 20, 2012. Less than four months later, the SEC reached a proposed settlement with CR Intrinsic and the Relief Defendants, as embodied in the CR Intrinsic Consent Judgment and Relief Defendant Consent Judgments now before the Court, and sought the Court's approval. The speed of the resolution reached was matched only by the immense sums of the proposed settlement – in excess of $600 million in disgorgement, penalties, and interest – representing essentially everything the SEC demanded and, arguably, as much as the SEC might be able to recover if it were to prevail at trial. However, despite this weighty monetary judgment to which they willingly consent, CR Intrinsic and the Relief Defendants neither admit nor deny the allegations contained in the Amended Complaint. In this

Court's view, it is both counterintuitive and incongruous for defendants in this SEC enforcement action to agree to settle a case for over $600 million that would cost a fraction of that amount, say $1 million, to litigate, while simultaneously declining to admit the allegations asserted against it by the SEC. An outside observer viewing these facts could readily conclude that CR Intrinsic and the Relief Defendants essentially folded, in exchange for the SEC's concession enabling them to admit no wrongdoing.

In this respect, particularly pertinent to the Court's concerns is the pendency of the related criminal proceeding. Martoma has been charged with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and two counts of securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, all arising out of the very same circumstances that are the subject of the SEC's civil enforcement action now before the Court, and that almost inherently entail conduct implicating some or all of the Relief Defendants.  See Indictment, United States v. Martoma, 12 Cr. 973 (S.D.N.Y. Dec. 21, 2012), Dkt. No. 7.

The dismissal of charges against Martoma or his acquittal at trial could make the SEC's decision to include "neither admit nor deny" provisions in this action appear

21

reasonable. In Cioffi, the court explicitly weighed the effect of acquittals in the related criminal case in its decision to approve proposed consent judgments containing the "neither admit nor deny" provision in an SEC enforcement action: "In light of the acquittals in the criminal case, the SEC reasonably opted to pursue settlement as the safest means of protecting the public interest." Cioffi, 868 F. Supp. 2d at 74.

On the other hand, a conviction at trial or a guilty plea in the related criminal case could establish facts potentially decisive to the SEC's allegations of wrongdoing in this enforcement action, thus rendering a premature judicial seal of approval on the "neither admit nor deny" provisions at issue here appear particularly pernicious. A judgment in the criminal proceeding would presumptively establish facts of wrongdoing that a settlement in this action does not expressly acknowledge – an incongruity obvious to even the most casual observer. The pendency of this related criminal proceeding, which might be resolved at trial in a matter of months, thus provides compelling reason for the Court not to simply rubber stamp the CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments, a consideration which was not included among the

circumstances presented to the court in Citigroup I.    See generally Citigroup I, 827 F. Supp. 2d 328.

The SEC has pointed to another case in this district, S.E.C. v. Sigma Capital Management, LLC, No. 13 Civ. 1740 (S.D.N.Y.), in urging the Court to approve the CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments.   In Sigma Capital, the SEC brought a civil enforcement action against Sigma Capital Management, LLC ("Sigma Capital"), which is an affiliate of CR Intrinsic, alleging insider trading resulting in illicit profits and losses avoided of $6.425 million. See Complaint, S.E.C. v. Sigma Capital Management, LLC, No. 13 Civ. 1740 (S.D.N.Y. Mar. 15, 2013).

As in this case, Sigma Capital involved parallel related criminal proceedings against certain key individuals implicated in the SEC's allegations.   In fact, one such individual, Jon Horvath ("Horvath"), pled guilty to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and two counts of securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder on September 28, 2012, prior to the institution of the SEC's civil enforcement action. See Minute Entry, United States v. Newman, No. 12 Cr. 121 (S.D.N.Y. Sept. 28, 2012).   A second individual, Michael

23

Steinberg ("Steinberg"), was arrested and charged with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and four counts of securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder on March 29, 2013. See Superseding Indictment, United States v. Newman, No. 12 Cr. 121 (S.D.N.Y. Mar. 29, 2013), Dkt. No. 230.

Although Judge Harold Baer approved the proposed consent judgments in Sigma Capital, the Court here, while taking cognizance of that case, finds that there is an important difference between Sigma Capital and this case that cautions against reflexively following in Sigma Capital's footsteps. Specifically, Sigma Capital's decision to forego incurring a substantial expense, let us assume, $1 million in litigation costs, to settle the Sigma Capital action and disgorge $6.425 million, plus an equivalent civil penalty, would appear to a reasonable observer and an objective decision-maker as a very different proposition from, and arguably a more plausibly rational business decision than, CR Intrinsic's decision to forego spending, again let us assume, $1 million in litigation costs or even a proportional sum, in this action and disgorge $275 million, plus an equivalent civil penalty. Though the parties point out that in these types

24

of cases there may be risk to both parties of incurring the expense associated with going to trial because of the uncertainty of prevailing, that circumstance might be true in an action where the litigation costs and the exposure from liability may be relatively balanced. But how persuasive is that concern in a proceeding in which the defendants have essentially conceded practically all the liability they faced, and the facts pertaining to the admission of wrongdoing they seek to avoid might very well be revealed in parallel actions in any event?

The Court nonetheless takes note of Sigma Capital, although as it weighs whether to approve the CR Intrinsic Consent Judgment and Relief Defendant Consent Judgments in this action, the Court cannot fail to take note of seeing CR Intrinsic, through another affiliate, involved in a separate insider trading scheme not materially different from that at issue in the instant proceedings. That CR Intrinsic affiliates have been the subject of separate SEC enforcement actions for insider trading does not instill the Court with confidence that the package of monetary and injunctive relief combined with the "neither admit nor deny" provision, as proposed here, will have the desired effect.

In another case previously before Judge Rakoff, S.E.C.
v. Vitesse Semiconductor Corp., 771 F. Supp. 2d 304
(S.D.N.Y. 2011), the court approved certain proposed
consent judgments against two individual defendants
containing "neither admit nor deny" provisions in an SEC
enforcement action, in part because the related criminal
case had already been resolved with pleas of guilty: "[Two
defendants] have already admitted their guilt in the
parallel criminal proceedings; consequently, the public is
not left to speculate about the truth of the essential
charges here brought against them, for they have already
admitted those charges in another public forum." Id. at
310. However, since Vitesse, the SEC has modified its
policy so that proposed consent judgments may not contain
"neither admit nor deny" provisions where the defendants
charged have either admitted to or been convicted of
related criminal violations. See Edward Wyatt, S.E.C.
Changes Policy on Firms' Admission of Guilt, N.Y. Times,
Jan. 6, 2012, www.nytimes.com/2012/01/07/business/sec-to-
change-policy-on-companies-admission-of-guilt.html.
Because CR Intrinsic and the Relief Defendants are not
defendants in the related criminal proceeding, however, a
plea of guilty by Martoma or his conviction at trial would
not prevent the SEC, under this policy, from submitting

proposed consent judgments containing "neither admit nor deny" provisions.

The Court also notes that in <u>Vitesse</u>, the court approved the proposed consent judgment containing a "neither admit nor deny" provision as to Vitesse Semiconductor Corporation ("Vitesse"), the corporate defendant, and that Vitesse, unlike the individual defendants, had not pled guilty in a related criminal proceeding, nor was a defendant in such a proceeding. In explaining its approval of the proposed consent judgment, the court wrote:

> As for Vitesse, its contribution of $2.4 million in stock to the class action settlement fund in California, coupled with its $3 million penalty payment if the instant Consent Judgment is approved, were agreed to in spite of the company's current financial difficulties, which has left it with a net operating cash flow for the year just ended of less than $1.5 million. No reasonable observer of these events could doubt that the company has effectively admitted the allegations of the complaint in the way that, for a company, is particularly appropriate: by letting its money do the talking.

<u>Vitesse</u>, 771 F. Supp. 2d at 310 (citation omitted).

While the Court agrees that, as in <u>Vitesse</u>, here it is difficult for the Court to see CR Intrinsic's decision to hand over more than $600 million as anything other than an implicit admission of wrongdoing, the parallel private civil action nonetheless remains unresolved. <u>See</u> <u>Kaplan v.</u>

S.A.C. Capital Advisors, L.P., No. 12 Civ. 9350 (S.D.N.Y.).
To recover their losses, at best in part, these allegedly
defrauded investors must incur significant expenses over an
extended period of time to establish Defendants' liability
concerning precisely the same misconduct that the
Government has alleged in both this proceeding and the
pending related criminal case.  The approval of the CR
Intrinsic Consent Judgment and the Relief Defendant Consent
Judgments in the SEC's enforcement action would therefore
produce two important, potentially counterproductive
effects.

    First, final approval at this time would deny the
private plaintiffs of the benefit of a resolution that
potentially could ease the burden of proving their case,
prolong their litigation, and diminish the amount they
could recover.  These allegedly defrauded investors would
be unable to derive any "collateral estoppel assistance"
from the CR Intrinsic Consent Judgment and the Relief
Defendant Consent Judgments.  Citigroup I, 827 F. Supp. 2d
at 334.  "[A] consent judgment between a federal agency and
a private corporation which is not the result of an actual
adjudication of any of the issues. . . . can not [sic] be
used as evidence in subsequent litigation between that
corporation and another party."  Lipsky v. Commonwealth

United Corp., 551 F.2d 887, 893 (2d Cir. 1976).   In
Citigroup I, the court concluded that such an arrangement
"leaves the defrauded investors substantially short-
changed." 827 F. Supp. 2d at 334.   Second, to the extent
it takes the parties longer to resolve the private
litigation, it imposes a heavier burden on the courts.   The
Court must accord these adverse effects serious
consideration where, as here, they result from a policy or
practice of the Government.

The Court must take cognizance that by means of the
proposed settlement, the parties resolve the issues and the
narrow interests they deem essential to them.   But these
settlements do not always take adequate account of another
interest ordinarily at stake as well: that of the public
and its interest in knowing the truth in matters of major
public concern.   It is in part to ensure adequate
consideration of public concerns in these settlements that
courts are granted authority to pass upon their
reasonableness, and judicial approval made a prerequisite
to give effect to consent judgments.   Part of the Court's
reluctance to approve the proposed settlement here at this
time is premised on the fact that settlement, especially a
settlement on this order of magnitude, without an admission
of liability, especially when there are pending related

criminal proceedings, "would deprive the public, on an important matter of public concern, of an adjudication of the truth of the [SEC's] allegations." Circa II, 2012 WL 3987610, at *5; see also Vitesse, 771 F. Supp. 2d at 309 ("Only one thing is left certain: the public will never know whether the S.E.C.'s charges are true, at least not in a way that they can take as established by these proceedings.").

In sum, to place the Court's perspective in full context, several principles already acknowledged above bear repeating. The Court recognizes that the SEC has proffered reasonable grounds for its agreement to the monetary and injunctive relief provisions of the proposed settlement. Under the CR Intrinsic Consent Judgment and the Relief Defendant Consent Judgments, CR Intrinsic and the Relief Defendants agree to disgorge all of the alleged illicit profits or losses avoided, as well as an equivalent sum as a civil penalty. The SEC reasonably concluded that this amount represented an adequate assessment of its anticipated recovery if it in fact went to trial. See Federal Trade Comm'n v. Circa Direct LLC, Civ. No. 11-2172, 2012 WL 2178705, at *4 (D.N.J. June 13, 2012) (recognizing that "the FTC could not have obtained a better monetary recovery if it had prevailed at trial"). The Court also

recognizes that in many, if not most, cases, "neither admit nor deny" provisions are essential to bring corporate defendants, which are frequently also facing private civil actions, to the bargaining table. See Citigroup II, 673 F.3d at 165 ("Requiring such an admission would in most cases undermine any chance for compromise."). The Court is also "bound . . . to give deference to [the SEC's] assessment of the public interest." Citigroup II, 673 F.3d at 168 (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 866 (1984) ("The responsibilities for . . . resolving the struggle between competing views of the public interest are not judicial ones: Our Constitution vests such responsibilities in the political branches.") (internal quotation marks omitted); In re Cuyahoga Equip. Corp., 980 F.2d 110, 118 (2d Cir. 1992) ("Appellate courts ordinarily defer to the agency's expertise and the voluntary agreement of the parties in proposing the settlement.")).

However, the Court once again emphasizes that, while such deference is particularly appropriate in unexceptional cases, courts must bring to bear enhanced scrutiny in reviewing proposed consent judgments in certain extraordinary cases alleging extraordinary public and private harms, in recognition of their particular

importance to the public interest, notwithstanding the deference normally accorded the policy decisions of federal administrative agencies.  Courts can and have brought to bear such enhanced judicial scrutiny to actions brought by the Government, including, in some circumstances, denying the Government's requests to drop criminal charges or rejecting the terms of a civil settlement as inadequate. See United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie, 428 F. Supp. 114, 117 (S.D.N.Y. 1977) ("After reviewing the entire record, the court has determined that a dismissal of the indictment against Mr. Massaut is not in the public interest.  Therefore, the government's motion to dismiss as to Mr. Massaut must be and is denied."); S.E.C. v. Bridge Premium Fin., LLC, 12 Civ. 2131, slip op. at 1 (D. Colo. Jan. 17, 2013) ("I refuse to approve penalties against a defendant who remains defiantly mute as to the veracity of the allegations against him.  A defendant's options in this regard are binary: he may admit the allegation or he may go to trial.").

The Court also cannot ignore that this issue, namely whether to approve proposed consent judgments in administrative agency enforcement actions containing "neither admit nor deny" provisions, not only is currently

under consideration by the Second Circuit, see Citigroup
II, 673 F.3d 158, but also has been addressed by several
other districts across the country, see Circa II, 2012 WL
3987610; Bridge Premium Fin., 12 Civ. 2131, slip op. at 1.
The Second Circuit's ultimate decision in the Citigroup
case must have some bearing in how the Court treats the
issue now before it.   Given the Court's weighty concerns
discussed above and the pending Citigroup II appeal in the
Second Circuit, the Court will condition its approval of
the CR Intrinsic Consent Judgment and the Relief Defendant
Consent Judgments upon the Second Circuit's ruling in the
Citigroup matter.

### III.  ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Court grants approval of the Final
Judgment as to Defendant CR Intrinsic Investors, LLC; the
Final Judgment as to Relief Defendant CR Intrinsic
Investments, LLC; the Final Judgment as to Relief Defendant
S.A.C. Capital Advisors, LLC; the Final Judgment as to
Relief Defendant S.A.C. Capital Associates, LLC; the Final
Judgment as to Relief Defendant S.A.C. International
Equities, LLC; and the Final Judgment as to Relief
Defendant S.A.C. Select Fund, LLC, conditioned upon the
disposition of the pending appeal in the U.S. Court of

33

Appeals for the Second Circuit in <u>S.E.C. v. Citigroup Global Markets, Inc.</u>, 11 Civ. 7387 (S.D.N.Y.).


**SO ORDERED:**

Dated:   New York, New York
         15 April 2013

                                   Victor Marrero
                                      U.S.D.J.