```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/19/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

      - against -

CR INTRINSIC INVESTORS, LLC, MATTHEW MARTOMA, and DR. SIDNEY GILLMAN,

                Defendants,
and

CR INTRINSIC INVESTMENTS, LLC, S.A.C. CAPITAL ADVISORS, LLC, S.A.C. CAPITAL ASSOCIATES, LLC, S.A.C. INTERNATIONAL EQUITIES, LLC, and S.A.C. SELECT FUND, LLC,

                Relief Defendants.

**12 Cv. 08466 (VM)**

**DECISION AND ORDER**

---

**VICTOR MARRERO, United States District Judge.**

    The Securities and Exchange Commission ("SEC") initiated the instant enforcement action on November 20, 2012, against Defendants CR Intrinsic, Matthew Martoma ("Martoma"), and Sidney Gillman ("Gillman") (collectively, "Defendants"). The SEC alleges Defendants violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q [the "Securities Act"]; Section 10(b) of the Exchange Act, 15 U.S.C. § 78 [the "Section 10(b)"] and Rule 10b-5 promulgated thereunder, C.F.R. § 240.10b-5. On June 18, 2014, the Court entered Final Judgments in this action and ordered Defendants to collectively pay disgorgement of $274,972,541, prejudgment

1

interest of $51,802,381.22, and a $274,972,541 civil penalty to resolve the SEC claims. (See Dkt. Nos. 60-66.) Defendants agreed to pay a total of $601,832,697.04 in satisfaction of the Final Judgments.

The SEC then moved to establish a Fair Fund for the benefit of investors who traded contemporaneously with Defendants from July 21 to July 29, 2008, the relevant period when Defendants traded on the basis of insider information. (Dkt. Nos. 74, 75.) The Court established the Fair Fund consisting of the amounts paid by Defendants and on February 4, 2016, it approved the SEC's Distribution Plan, finding that it was fair and reasonable. (Dkt. Nos. 84, 122 at 5-6.) As of now, the SEC has completed distribution of disgorgement funds to all eligible claimants with a residual $75,232,529.11 [hereinafter the "Residual"] remaining in the Fair Fund. (Dkt. No. 317 at 4.)

On April 22, 2024, the SEC filed a Motion for an Order Approving the Final Accounting, Transferring Funds to the U.S. Treasury, Terminating the Fair Fund, and Discharging the Distribution Agent [hereinafter the "SEC Motion"]. (Dkt. No. 316.) On May 6, 2024, interested party Pfizer Inc.'s ("Pfizer") filed its Opposition to the SEC's Motion to Transfer the Remaining Funds and Cross-Motion for an Order Transferring the Funds Remaining in the Fair Fund to Wyeth

LLC [hereinafter "Wyeth"], Pfizer's subsidiary. (Dkt. No. 320 [hereinafter "Pfizer's Cross-Motion" or "Cross-Motion"].)

For the reasons below, the Court GRANTS the SEC's Motion, and DENIES Pfizer's Cross-Motion.

## I.   BACKGROUND

Wyeth was a pharmaceutical company engaged in the development and distribution of health products. (See Dkt. No. 25 at 6 [hereinafter "Amended Complaint".]) Between 2006 and 2008, Wyeth collaborated with Elan Corporation ("Elan"), a biotechnology company, in developing a potential drug to treat Alzheimer's disease. (Amended Complaint ¶¶ 22-23.) Elan and Wyeth conducted joint clinical trials for a potential drug to treat Alzheimer's disease called bapineuzumab ("bapi"). (Id.) Gilman, a neurologist, served as Chairman of the clinical trial's Safety Monitoring Committee ("SMC") and had entered into consulting and confidentiality agreements with Elan that prohibited him from sharing any data from the trials with anyone outside of the SMC. (Id. ¶¶ 26-28.)

During the course of the clinical trial, Gilman sold to Martoma, a portfolio manager at CR Intrinsic Investors, LLC, confidential data concerning the adverse effects of bapi and negative results of the clinical trials. (Id. ¶ 29-34, 39-47) Martoma then used this confidential information to cause C.R. Intrinsic to trade ahead of Gilman's announcement of the

3

negative bapi clinical trial results. (Id. ¶¶ 40-53.) On July 29, 2008, Gilman presented the results of the clinical trial. (Id. ¶ 56.) The next day, Wyeth's stock price fell from $45.11 to $39.74, a decrease of approximately 12 percent. (Id. ¶ 57.) As a result of the trades, Defendants reaped profits and avoided losses of approximately $275 million. (Id. ¶ 58.)

In October 2009, Pfizer acquired Wyeth as a wholly owned subsidiary. In November 2012, the SEC initiated this action against CR Intrinsic Investors, Martoma, and Gilman. (Dkt. No. 1.) Eventually, the Defendants entered into consent agreements with the SEC and the Court ordered Defendants to collectively pay disgorgement of $274,972,541, prejudgment interest of $51,802,381.22, and a $274,972,541 civil penalty to resolve the SEC's claims. (Dkt. No. 60.) The SEC then moved to establish a Fair Fund and appoint a Tax Administrator. (Dkt. No. 74-75.)

The SEC recommended that the Fair Fund be established for "the benefit of those investors who traded contemporaneously with Defendants from July 21 to July 29, 2008, up to 100% of such investors' harm, with the remainder of the funds, if any, to be sent to the Treasury" (the "Distribution Plan"). (Dkt. No. 75.) The SEC requested that civil penalties be included in the Fair Fund, as disgorgement alone may not compensate investors fully for their harm. (Id.

4

at 7.) Pfizer objected to the transfer of Residual funds to the Treasury. (Dkt. No. 80.) However, both the SEC and Pfizer agreed that the issue of the Residual should not be addressed until disgorgement funds were distributed to all affected investors. (Id.) Accordingly, Pfizer and the SEC asked the Court to delay its determination as to where any Residual would be distributed until the contemporaneous investors were fully compensated. (Id.)

On November 23, 2015, the SEC moved for an order approving a proposed Distribution Plan for the Fair Fund. (Dkt. No. 102.) Under the Distribution Plan, investors who traded in Wyeth and Elan stock between July 21, 2008, through July 29, 2008, would be eligible for compensation based on their loss per share purchased. (Dkt. No. 103 at 5.) On February 4, 2016, the Court approved the Distribution Plan. (Dkt. No. 122.) By January 2024, the Court-appointed Distribution Agent reported that $532,296,692.67 had been distributed to eligible claimants. (Dkt. No. 315.)

The SEC then filed the instant motion informing the Court that distribution was complete, seeking approval of the final accounting of the Fair Fund, and seeking to transfer the Residual $75,232,529.11 to the U.S. Treasury. (Dkt. No. 317.) On May 6, 2024, Pfizer filed the Cross-Motion seeking to transfer the Residual to Wyeth LLC, arguing that Wyeth, as

5

the company whose shares were traded in violation of the securities laws, and/or Pfizer are victims entitled to disgorgement funds under the Fair Funds statute, 15 U.S.C. § 7246. (Dkt. No. 320.) On July 8, 2024, the SEC filed a Response to Pfizer's Cross-Motion for an Order Transferring the Funds Remaining in the Fair Funds to Wyeth LLC (hereinafter "the SEC Opposition"), asserting that Wyeth is not a victim harmed by Defendants' insider trading scheme and is thus not a reasonable recipient of the Residual. Pfizer filed its Reply in Further Support of its Cross-Motion for an Order Transferring the Funds Remaining in the Fair Fund to Wyeth LLC ("Pfizer's Reply") on August 7, 2024. (Dkt. No. 326.)

## II.  LEGAL STANDARD

A district court has broad equitable discretion when crafting remedies for violations of the 1934 Securities Act. S.E.C. v. Fishbach Corp., 133 F.3d 170 (1997). Once profits have been preliminarily disgorged to the SEC, "it remains within the court's discretion to determine how and to whom the money will be distributed." Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C., 467 F.3d 73, 81 (2d Cir. 2006). Although disgorged funds may be distributed to defrauded investors, "[t]he primary purpose of disgorgement orders is to deter violations of the securities laws by

depriving violators of their ill-gotten gains." Id. If the district court determines that no party is entitled to receive disgorged profits, those funds are to be paid to the Treasury. See Fishbach, 133 F.3d at 171, 176.

### III. DISCUSSION

Section 301(a) of the Sarbanes Oxley Act, as amended by the Dodd-Frank Act of 2010, authorizes the SEC to add civil penalties to a disgorgement fund established "for the benefit of the victims" of a violation of the securities laws. 15 U.S.C. § 7246(a). Pfizer argues that the Residual of the instant disgorgement fund should be transferred to Wyeth because Wyeth was a victim of Defendants' insider trading scheme. (See Cross-Motion at 10.) According to Pfizer, Gilman breached a fiduciary duty to Wyeth by misappropriating confidential results from Wyeth's clinical trial to facilitate a lucrative and fraudulent trade by CR Intrinsic and Martoma. (Id.) Accordingly, Pfizer maintains that under 15 U.S.C. § 7246(a) and general equitable principles, Wyeth is the next best recipient of the Residual. (Id. At 10-17.)

The SEC opposes transferring the Residual to Wyeth on various grounds. First, the SEC disputes Wyeth's status as a victim of the insider trading scheme, arguing that Wyeth has not established any pecuniary harm stemming from Gilman's misappropriation of non-public information. (Opposition at 8-

7

11.) The SEC also argues that even if Wyeth were a victim, the Residual should be deemed composed of only civil penalties not subject to distribution. (Id. at 12-14.) Finally, the SEC contends that transferring the Residual to Wyeth would unjustly enrich Pfizer. (Id. at 19.)

### A. THE RESIDUAL IS SUBJECT TO EQUITABLE PRINCIPLES

As an initial matter, the Court disagrees with the SEC as to whether the Residual is subject to the Court's equitable discretion due to their purported status as civil penalties. The SEC requested that civil penalties be included in the disgorgement fund in the event the disgorgement award did not fully compensate all contemporaneous investors. Faced with that prospect, the amount of funds distributed greatly exceeded the disgorgement and prejudgment interest paid, which necessarily means that civil penalties were also distributed to investors.

While it is true that the Residual constitutes the remaining civil penalty payments, it is still subject to distribution for the benefit of the victims by virtue of their placement in the Fair Fund. The statute provides that if the Commission obtains a civil penalty, "the amount of such civil penalty shall, on the motion or at the direction of the Commission, be added to and *become part of a disgorgement* fund . . . established for the benefit of the victims." 15

U.S.C. § 7246(a) (emphasis added). Once the civil penalties are in the disgorgement fund, they have "become part of the disgorgement fund." Id. In creating the Fair Fund, the SEC anticipated a possibility for which potentially the entire civil penalty payment would have to be distributed in order to fully compensate investors. If the SEC was concerned about retaining the civil penalties Defendants paid, it could have requested Court approval to withhold a portion of the penalty payments when moving to establish a Fair Fund. The SEC cannot, after asking the Court to place such payments in a disgorgement fund, come back now and argue that the monies cannot be distributed because they do not constitute disgorged funds.

As such, the Court has discretion as to whether the Residual should be distributed to additional purported victims of Defendants' conduct.

### B. WYETH'S EQUITABLE CLAIM TO THE RESIDUAL

The central premise of Wyeth's claim to the Residual is that it is a "victim" under 15 U.S.C. § 7246(a). The Sarbanes Oxley Act formally granted the SEC the authority to seek equitable remedies, including disgorgement. See 15 U.S.C. § 78u(d)(7). Section 308(a) of the Sarbanes Oxley Act further authorized the SEC to consolidate disgorged funds and civil penalties "for the benefit of the victims of such violation."

9

15 U.S.C. § 7246(a). A plain reading of the statute indicates that these funds and penalties in the disgorged fund should be distributed to "victims" of defendants' actions whenever feasible. Thus, the key issue here is whether Wyeth is a "victim" under 15 U.S.C. § 7246(a) and thus entitled to payment from the Residual to cover losses allegedly caused by the underlying violations of the securities laws.

### 1. "Victim" Under the Fair Funds Statute

The Fair Funds Statute does not define the term "victim" and the Court is not aware of any authority that discusses the definition as used in this specific statute. However, the Court may look beyond the Fair Funds statute to 15 U.S.C. § 78u(d)(5), which works in tandem with the Fair Funds Statute in granting the SEC authority to seek equitable relief such as disgorgement. See 15 U.S.C. 78u(d)(5) ("[A]ny Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."). Analyzing § 78u(d)(5), Courts have extensively discussed when disgorgement funds can be distributed to victims of securities violations. These cases offer valuable guidance in determining whether Wyeth qualifies as a victim under the Fair Funds Statute and companion securities laws.

In 2020, the Supreme Court held that disgorgement is an equitable remedy under 15 U.S.C. § 78u(d)(5), permissible

10

only where "it does not exceed a wrongdoer's net profits." Liu v. SEC, 591 U.S. 71, 75 (2020). The Court also held that equity principles required restricting the disgorgement remedy "to an individual wrongdoer's net profits to be awarded for victims." Id. 591 U.S. at 79. Following Liu, the Second Circuit clarified the meaning of "victims" in SEC v. Govil, 86 F.4th 89 (2d Cir. 2023). The Second Circuit held that under Liu, §§ 78u(d)(5) and 78u(d)(7) require "that disgorgement must be awarded for victims." Govil, 86 F.4th at 98. Based on the equitable limitations in Liu, the Second Circuit concluded that "an investor who suffered no pecuniary harm as a result of the fraud is not a victim." Id. Remanding the case to the lower court, the Second Circuit instructed the district court to make a finding of pecuniary harm before awarding equitable relief to victims of securities fraud. Id. at 106.

As Govil dictates, before awarding Wyeth any payment from the Residual, this Court must make a predicate finding that Wyeth suffered pecuniary harm due to the defendants' actions. Id. at 105. Pfizer cannot point to any case law post-Liu and Govil that negates the pecuniary harm requirement.

Pfizer argues that they are not required to show pecuniary harm to Wyeth, citing Second Circuit authority that purportedly rejects the requirement of pecuniary harm when

11

disgorged funds are distributed to victims. Those cases, however, preceded Liu and Govil and are thus inapposite. In SEC v. Texas Gulf Sulphur, the Second Circuit rejected an argument that a district court did not have the authority to impose a restitution order because the order did not serve to compensate the victims "who have been damaged." 446 F.2d 1301, 1308 (2d Cir. 1971). Instead, the Second Circuit observed that a "corporate enterprise may well suffer harm 'when officers and directors abuse their position to obtain personal profits' since 'the effect may be to cast a cloud on the corporation's name, injure stockholder relations and undermine public regard for the corporation's securities." Id. The harm described by the Second Circuit in Texas Gulf Sulphur is certainly relevant to Wyeth's situation, but the Texas Gulf Sulphur court did not require a factual determination as to pecuniary harm of the corporation. It simply suggested that a corporation may suffer harm when corporate insiders abuse their positions to gain personal profit.

Govil has since established that a district court must make a factual determination as to pecuniary harm before awarding disgorgement as equitable relief. Speculative claims about the general harm that can occur to a corporation as a

result of insider trading are insufficient for this Court to reach such a factual finding.

Pfizer alternatively argues that Wyeth does not need to show pecuniary harm because such a showing was not required by the contemporaneous shareholders who were awarded disgorgement payments from the Fair Fund. The Distribution Plan compensated investors who traded Wyeth securities contemporaneously with Defendants over a nine-day period and suffered harm as a result of Defendants' failure to disclose material non-public information. (Dkt. No. 116-2.) The per-share harm was calculated by using event studies to measure the price drop on the first business day following the disclosure of the clinical trial results in order to calculate the artificial inflation of the Wyeth's stock price when defendants had access to the information but did not disclose it. (Dkt. No. 116-2 at 4.) According to Pfizer, this method was not about compensating a loss caused by the insider trading scheme, but to put contemporaneous shareholders on the same footing as Defendants "in terms of available information." (Cross-Motion at 21.) Pfizer argues that the defendants' lack of involvement in the decision to publicly disclose the trial results means any investor losses are unrelated to the defendants' insider trading. (Cross-Motion at 21, Reply at 4.) This argument reflects a fundamental

misunderstanding of how courts evaluate investor harm in insider trading cases.

Under the classical theory of insider trading, trading on insider information qualifies as a "deceptive device" under Section 10(b) and an insider has a "duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed stockholders." U.S. v. O'Hagan, 521 U.S. 642, 652 (1997). The duty to disclose or abstain from trading is rooted in the idea that if insiders disclosed the information to the market before trading, contemporaneous investors would not have purchased the shares in question. See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 239 (2d Cir. 1974).

Here, Defendants Martoma, Gilman, and C.R. Intrinsic were "under a duty to the investing public . . . not to trade in or recommend trading in [Wyeth] stock without publicly disclosing" the information regarding the negative trial results. Id. Their failure to disclose harmed contemporaneous investors who bought the stock at an inflated price that did not reflect the insider information held by the Defendants. Contrary to Pfizer's assertion, the key question is not whether "the gains or losses experienced by contemporaneous shareholders would have been any different had Defendants

14

never engaged in insider trading." (Reply at 4.) Instead, the principle underlying the Distribution Plan is whether the Defendants' failure to disclose this information would have caused investors to buy the stock at a lower price or not purchase it at all. Therefore, by requiring investors to show that they traded in Wyeth's stock contemporaneously with defendants, they were required to establish pecuniary harm due to defendants' insider trading. Under the analysis of the concept of victim discussed above, without a showing pecuniary harm, Wyeth is not a victim of the securities violations at issue here and thus cannot recover disgorgement funds.

2. Wyeth's Status As A Victim Under the Fair Funds Statute

Equitable relief in the form of disgorgement must be awarded to victims which, in turn, requires a finding of pecuniary harm. Govil, 86 F.4th at 106. Wyeth has failed to make the requisite showing of pecuniary harm caused by Defendants' violations of the securities laws. Instead, Pfizer, in conclusory fashion, argues that Wyeth was harmed when its fiduciary misappropriated the results from a clinical trial for insider trading and suffered reputational harm from the proceeding scandal. The Court certainly agrees that corporations whose secrets are misappropriated for

15

insider trading purposes are generally victims of wrongdoing, but Pfizer has failed to allege how the insider trading scheme and Wyeth's subsequent reputational harm qualifies as <u>pecuniary</u> harm for purposes of distributing the disgorged funds. Pfizer does not point to any facts indicating a monetary loss Wyeth suffered as a result of the insider trading scheme. Instead, Pfizer notes that Wyeth suffered a loss of $7 billion in market capitalization when the bapi clinical trial results were announced. (Cross-Motion at 19.) However, this loss in capitalization occurred three years before the insider trading scheme became public and can be attributed to the failure of the trials themselves, which would have happened regardless of Defendants' actions.

Pfizer also appears to attempt to quantify Wyeth's reputational harm by noting that Wyeth's goodwill was $4 billion at the time of Pfizer's acquisition and the Fair Fund balance represents 2 percent of that amount. It may be true that Wyeth suffered an economic loss due to defendants' insider trading scheme and that loss may very well be substantially more than $75 million. However, the Court lacks sufficient information to make a factual determination as to the actual losses Wyeth may have suffered due to Defendants' insider trading scheme to award Wyeth disgorged funds.

### C. IT IS FAIR AND REASONABLE TO TRANSFER THE RESIDUAL TO THE TREASURY

The Distribution Agent has distributed disgorgement and penalties to all eligible claimants. (Dkt. No. 317 at 3.) The victims of Defendants' insider trading have been fully compensated for their harm and no other party has come forth asserting an equitable claim to the moneys in the Fair Fund. Because Pfizer has not adequately established pecuniary harm as to Wyeth, it is fair and reasonable to transfer the Residual to the U.S. Treasury. Transferring the Residual to the U.S. Treasury to be used by the Government for its operations accomplishes "the greatest good for the greatest number of people." S.E.C. v. Bear, Sterns & Co. Inc., 626 F. Supp. 2d 402, 419 (S.D.N.Y. 2009); see also S.E.C. v. Drexel Burnham Lambert, Inc., 956 F. Supp. 503, 508 (S.D.N.Y. 1997) (directing the transfer of disgorgement funds to the U.S. Treasury after finding that it would be infeasible to distribute the funds to the shareholder victims).

Pfizer points out that the Supreme Court in Liu questioned the practice of depositing disgorgement funds with the Treasury, arguing that the practice is disfavored. The Court was indeed skeptical of "ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims." Liu, 591 U.S. at 85. However, Govil, which

17

interprets Liu, clearly requires a finding of pecuniary harm before disgorged funds are distributed to victims. As discussed above, on the factual record before it, this Court cannot make such a finding.

In the absence of any additional victims with a claim for equitable relief, the Residual should be transferred to the U.S. Treasury.

Wyeth is not without a remedy. As Pfizer notes in its briefing, Wyeth may have a viable claim of damages for breach of fiduciary duty against these Defendants. See Diamond v. Oreamuno, 248 N.E.2d 910 (N.Y. 1969); Brophy v. Cities Serv. Co., 70 A.2d 5, 8 (Del. Ch. 1949). The Court is not concerned about the risk of double recovery in this situation. Pfizer argues that not directing the Residuals to Wyeth would risk double recovery because, in some cases, courts held the remaining disgorged profits in a trust that would be tapped when a victim won a damages award against the defendant. See In re Symbol Technologies Sec. Litig., 762 F. Supp. 510 (E.D.N.Y. 1991); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2d Cir. 1971). Courts created these trusts in anticipation of pending actions seeking the same recovery. If other plaintiffs succeeded in those actions, they could draw from the trust rather than directly from defendants.

Pfizer argues that Wyeth should similarly draw from the Fair Fund in lieu of recovering in a separate action. Neither Wyeth nor Pfizer has asserted any claims for relief against the Defendants and it remains unclear what damages or monetary relief they may be owed for Defendants' actions. There are no related proceedings pending that would justify holding the Residual in trust until their resolution. It is further unclear what type of damages Wyeth would claim in a hypothetical action for breach of fiduciary duty. If those damages were for reputational harm caused to Wyeth, such damages would be distinct from the disgorgement and civil penalties required in this case. Given this uncertainty, it makes little sense to award Pfizer the Residual due to fear of a potential double recovery in a hypothetical breach of fiduciary duty action.

## IV.   ORDER

For the reasons stated above, the Motion of plaintiff Securities and Exchange Commission requesting distribution of the Residual as described herein (Dkt. No. 316) is hereby <u>GRANTED</u> and payment of such Fund is directed to be made to the United States Treasury, as set forth in the accompanying Order. The cross-motion of Pfizer for a transfer of the Residual to Wyeth (Dkt. No. 320) is hereby <u>DENIED</u>. The Clerk

is respectfully directed to terminate the motions at Dkt. Nos. 320 and 316.

**SO ORDERED.**

Dated:   19 November 2024
         New York, New York

_____
Victor Marrero
U.S.D.J.